Name: Donald M. Paradis
Prison Number: 18362
Place of Confinement: Idaho State Correctional Institution, Boise, Idaho

William L. Mauk
Skinner, Fawcett & Mauk
515 South Sixth Street
P.O. Box 700
Boise, Idaho 83701-0700
Telephone: (208) 345-2654

Edwin S. Matthews, Jr.
Coudert Brothers
1114 Avenue of the Americas
New York, New York 10036
Telephone: (212) 626-4400

Attorneys for Petitioner

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| DONALD M. PARADIS, Petitioner, v. A.J. ARAVE, Warden, Idaho State Correctional Institution, Respondent. | CASE NO. CV 95-0446-S-EJL<br>AMENDED PETITION FOR WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY |

TO: The Honorable ______________
United States District Court Judge
United States District Court for the District of Idaho

Petitioner, Donald M. Paradis ("Paradis"), by his attorneys, Skinner, Fawcett & Mauk and Coudert Brothers, petitions this Court for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254 as follows:

## INTRODUCTION

Donald Paradis was convicted and sentenced to death in Idaho for the murder of Kimberly Palmer which he did not commit. Since his trial five eyewitnesses have come forward and provided sworn testimony that the victim was killed in the State of Washington hours before Paradis is said to have killed her in Idaho and that Paradis was not involved in her murder. None of the eyewitnesses testified at Paradis' trial. One eyewitness, Thomas Gibson, has repeatedly confessed, since Paradis' trial, to Palmer's murder and has repeatedly exonerated Don Paradis. Moreover, uncontroverted forensic evidence which was not presented at Paradis' trial proves that it was impossible that Paradis committed this crime.

At his trial, Paradis was represented by a court-appointed neophyte lawyer who, as the police disclosed in 1993, was working for the Coeur d'Alene police and the Kootenai County Sheriff before and during Paradis' trial, appeal and post-conviction proceedings. The trial judge was aware that counsel was a policeman when the judge appointed him to represent Paradis, but Paradis did not know this until 1993. That the trial lawyer was working for the police was concealed by the trial lawyer from the court during Paradis' prior federal habeas corpus proceeding and from Paradis' present counsel.

In view of Paradis' factual innocence and in view of the serious conflict of interest affecting his court-appointed trial lawyer which affected his defense, this case presents a fundamental miscarriage of justice.

1. The name and location of the court which entered the judgment of conviction under attack: District Court of the First Judicial District of the State of Idaho, in and for the County of Kootenai, Coeur d'Alene, Idaho.

2. Date of judgment of conviction: December 10, 1981. Paradis was sentenced to death on April 7, 1982.

3. The sentence is that Donald M. Paradis be put to death in accordance with the provisions of Idaho Code Section 18-4004 and in the manner prescribed by Chapter 27 of Title 19, Idaho Code, which provides for death by firing squad or by intravenous injection at the discretion of the Idaho State Board of Corrections.

4. The nature of the offense involved is that Paradis was charged with the crime of murder in the first degree, Idaho Code Sections 18-4001, 18-4002, 18-4003 and 18-4004, in that "Donald M. Paradis, on or about the 21st day of June, 1980, ***in the County of Kootenai*** . . . between the hours of 12:45 a.m. and 7:00 a.m. did then and there unlawfully, willfully, deliberately and with malice aforethought, kill a human being, one KIMBERLY ANNE PALMER by strangling said KIMBERLY ANNE PALMER."

5. On February 23, 1981, before trial, Paradis pleaded not guilty to this crime.

6. The trial of the issue of guilt or innocence was before a jury. The hearing on aggravating and mitigating circumstances and the issue of sentencing was before a judge pursuant to Idaho Code Section 19-2515.

7. Paradis did not testify at the trial of his guilt or innocence. He did testify during the hearing on the issue of his sentence and reaffirmed his innocence.



NOV 09 '95 10:35PM COUDERT BROTHERS P.4

8. Paradis appealed his conviction and death sentence. The Supreme Court of the State of Idaho, by order dated December 19, 1983, affirmed Paradis' conviction and sentence in State of Idaho v. Donald M. Paradis, 106 Idaho 117, 676 P.2d 31 (1983) (Bistline & Huntley, J.J., dissenting). A timely petition for rehearing was denied by the Supreme Court of the State of Idaho on February 14, 1984. Id.

9. The Supreme Court of the United States denied Paradis' Petition for Writ of Certiorari to the Idaho Supreme Court on July 5, 1984.

10. On April 13, 1984, Paradis' court-appointed counsel filed a Petition for Post-Conviction Relief in the District Court for the First Judicial District of the State of Idaho, in and for the County of Kootenai. This Petition raised the following grounds related to the determination of his guilt:

(a) That the evidence presented at Paradis' trial was insufficient under Jackson v. Virginia to prove beyond a reasonable doubt that the victim was killed in Idaho.

(b) That the State of Idaho violated Paradis' constitutional rights by destroying exculpatory evidence when the State allowed the victim's body to be cremated;

(c) That Paradis was denied effective assistance of counsel;

(d) That Paradis was placed in double jeopardy by the admission of evidence of the murder of Scott Currier at Paradis' trial for the murder of Kimberly Palmer when Paradis had already been acquitted of Currier's murder;

(e) That the trial court's denial of Paradis' motion for a change of venue denied Paradis a fair trial; and

(f) That prejudicial statements made by the prosecutor during Paradis' trial deprived Paradis of a fair trial.



NOV 09 '95 10:35PM COUDERT BROTHERS

11. The District Court for the First Judicial District of the State of Idaho, in and for the County of Kootenai, on February 13, 1985 granted the State of Idaho summary judgment dismissing Paradis' Petition for Post Conviction Relief without an evidentiary hearing.

12. The Supreme Court of the State of Idaho affirmed the District Court's dismissal of Paradis' Petition for Post Conviction Relief on March 25, 1986. Paradis v. Idaho, 110 Idaho 534, 716 P.2d 1306 (1986). A timely petition for rehearing was denied by the Supreme Court of the State of Idaho on April 30, 1986. Id.

13. On June 9, 1986, Paradis filed a Petition for a Writ of Habeas Corpus with the United States District Court for the District of Idaho.

14. This Petition raised the following grounds:

(a) The evidence was insufficient under Jackson v. Virginia to demonstrate beyond a reasonable doubt that the victim was killed in the State of Idaho;

(b) The State failed to preserve exculpatory evidence;

(c) The introduction of evidence of another murder for which Paradis was acquitted deprived Paradis of his right to due process and violated the Double Jeopardy Clause;

(d) Paradis was denied his constitutional right to effective assistance of counsel at trial;

(e) Paradis was denied a fair trial by the prosecutor's misconduct;

(f) Paradis was denied a fair trial because the state trial judge refused to grant Paradis' motion for a change of venue;

(g) Paradis was sentenced to death on the basis of an unconstitutionally vague aggravating factor;

(h) Paradis was sentenced to death on the basis of undisclosed evidence which he had no opportunity to rebut or explain;

(i) Paradis was denied due process of law because the sentencing judge was biased against him;

(j) Paradis was denied his constitutional right to be sentenced by a jury;

(k) Paradis was denied his constitutional right to effective assistance of counsel at sentencing; and

(l) Paradis was sentenced to death without a finding that he demonstrated a sufficient level of culpability to warrant such a sentence.

15. The United States District Court for the District of Idaho denied Paradis' Petition for a Writ of Habeas Corpus on July 30, 1987. Paradis v. Arave, 667 F. Supp. 1361 (1987) (Ryan, J.).

16. The United States Court of Appeals for the Ninth Circuit affirmed the District Court's denial of a writ of habeas corpus as to Paradis' guilt, but reversed the District Court's denial of a writ of habeas corpus as to Paradis' sentence of death on January 23, 1992. Paradis v. Arave, 954 F.2d 1483 (9th Cir. 1992). Specifically, the Court of Appeals for the Ninth Circuit found that the sole aggravating factor upon which Paradis' sentence of death was based was unconstitutionally vague.

17. The United States Supreme Court vacated and remanded the Court of Appeals for the Ninth Circuit's decision as to the vagueness of the aggravating factor in the Idaho death penalty statute for further consideration in light of Creech v. Arave, 113 S.Ct. 1534 (1993). Arave v. Paradis, 113 S.Ct. 1837 (1993).

18. On remand, the Court of Appeals for the Ninth Circuit affirmed the District Court's denial of Paradis' writ of habeas corpus on March 23, 1994. Paradis v. Arave, 20 F.3d 950 (9th Cir. 1994).



NOV 09 '95 10:37PM COUDERT BROTHERS P.7

19. The United States Supreme Court denied Paradis' Petition for a Writ of Certiorari to the Court of Appeals on January 17, 1995.

20. On June 27, 1989, Paradis filed a Second Petition for Post-Conviction Relief in the District Court of the First Judicial District of the State of Idaho, In and For the County of Kootenai.

21. This Petition, as amended, raised the following grounds:

(a) That Paradis was denied his constitutional right to counsel free from conflicts of interests;

(b) That at the Larry Evans' trial the state's medical expert, who testified at Paradis' trial, changed the testimony he gave at the Paradis' trial and presented new testimony regarding the time and place of Palmer's murder which proves that Paradis is factually innocent of the crime of which he was convicted and of the death penalty;

(c) That new evidence proves that Paradis is factually innocent of the crime of which he was convicted and of the death penalty;

(d) That because Larry Evans, who was captured in 1986 and tried in 1987, was acquitted, although the Evans involvement in the alleged crime was indistinguishable from the alleged involvement of Paradis at his trial, the sentence of death is disproportionate as applied to Paradis; and

(e) That it is unconstitutional to execute Paradis because he is legally and factually innocent of the crime for which he was convicted and sentenced to death.

22. The District Court for the First Judicial District of the State of Idaho, in and for the County of Kootenai dismissed Paradis' Second Petition for Post Conviction Relief on August 24, 1994 without holding an evidentiary hearing.



NOV 09 '95 10:38PM COUDERT BROTHERS P.8

23. The District Court for the First Judicial District of the State of Idaho, in and for the County of Kootenai, on March 16, 1995, denied Paradis' motion for reconsideration of its order dismissing Paradis' Second Petition for Post Conviction Relief.

24. The District Court's dismissal of Paradis' Second Petition for Post Conviction is pending before the Supreme Court of Idaho.

## FACTUAL ALLEGATIONS

### 1. The Murder of Kimberly Palmer and Scott Currier

25. At about 12:45 a.m. on June 21, 1980, Kimberly Palmer ("Palmer") and Scott Currier ("Currier") checked into a motel in Spokane, Washington. This motel was around the corner from Paradis' house.

26. Shortly thereafter, Currier demanded his money back from the motel desk clerk. Currier told the clerk that he had found his guns missing from the blue and white Volkswagen van he was driving. Currier also stated that he knew who took his guns, and he was going to retrieve them.

27. Currier, together with Palmer, then went to Paradis' house in Spokane, Washington. At Paradis' house, Currier confronted Roseanna Moline ("Moline") and Charles Amacher ("Amacher"). Amacher was a member of the Gypsy Jokers motorcycle gang (as was Paradis). Amacher and Moline were from Portland, and had been staying at Paradis' house.

28. When Moline went into the kitchen in Paradis' house, Currier started yelling at her, shouting, I want my guns. I'm from the DEA and I want my guns. Moline then went to Paradis' garage to tell her boyfriend, Amacher, what was happening. Amacher had been working on a motorcycle.

29. While Moline and Amacher were in the garage, Thomas Gibson ("Gibson") and his girlfriend, Cindy Simera ("Simera"), arrived at Paradis' house. Gibson and Simera were from California, and were also staying at Paradis' house. Simera and Moline went back into Paradis' house, into the living room where Palmer was listening to the stereo. Gibson and Amacher went into the kitchen of Paradis' house where Currier was.

30. A fight then started between Amacher and Currier.

31. Paradis was not present at the house when Currier and Palmer arrived, nor when the fight started.

32. During the fight, Paradis and Larry Evans ("Evans") arrived at Paradis' house. As Paradis entered through the kitchen door, he saw Currier reach for something in his boot. Believing it to be a gun, Paradis hit Currier. The fight between Currier and Amacher then continued in the kitchen.

33. The fight with Currier then stopped, at least for the moment. Paradis then complained about the fight in his house. Paradis told Gibson, Amacher and Currier to clean up his house and leave, and then Paradis left.

34. After Paradis left, the fight between Currier and Amacher began again. The fight moved to the basement of Paradis' house. In this fight, Amacher killed Currier.

35. Moline left the living room for a moment, walked through what she described as a "bloodbath in the kitchen," to the basement stairs. From there, she saw Currier's dead body on the basement floor, naked except for blue underwear.

36. Amacher and Gibson then came upstairs. As Palmer came through the living room, Gibson caught and strangled her.



NOV 09 '95 10:39PM COUDERT BROTHERS P.10

37. At this point in time, someone at Paradis' house called to the house of another member of the motorcycle gang, Norman. Terry Jones was at Norman's house at the time of the telephone call. After the telephone call, Norman told Terry Jones to go to Paradis' house quickly and Jones did so.

38. When he arrived at Paradis' house, Terry Jones saw the dead body of a female on the ground floor, and the dead body of a male in the basement.

39. After Palmer was killed, and before Terry Jones arrived, Paradis had returned to his house. Paradis felt that if he called the police and explained that upon his return that he had found two dead bodies in his house, no one would believe he was not involved. So, he did not call the police.

40. Amacher suggested that the bodies be taken to a nearby Safeway dumpster. Instead, Paradis, Gibson, Evans and/or Amacher put Currier's body in a blue sleeping bag, put Palmer's body in a red sleeping bag, and loaded the bodies into the blue Volkswagen van Currier had been driving.

41. Paradis, Evans and Gibson then drove the van from Spokane about 20 miles to Post Falls, Idaho. Amacher and Moline stayed behind to clean up Paradis' house, and Moline mopped up the blood from the kitchen floor.

42. At Post Falls, Gibson drove the Volkswagen van up Mellick Road. The van stalled and started rolling backwards, turned sideways and stopped.

43. Evans dragged the blue sleeping bag containing Currier's body, which weighed over 200 pounds, off in one direction. Paradis took the red sleeping bag containing Palmer's body, which weighed approximately 100 pounds, down a steep slope. As Paradis carried the

sleeping bag over his shoulder, Palmer's body fell out of the bag. Paradis then carried Palmer's body down the slope, dragged Palmer's body under a barbed-wire fence near the bottom of the slope, left the body at the bottom and covered it with branches.

44. Gibson, Evans and Paradis, less than fifteen to thirty minutes after driving up Mellick Road, walked back toward Post Falls, Idaho.

45. The afternoon of the next day, June 22, 1980, the police found the bodies of Palmer and Currier off of Mellick Road near the overturned Volkswagen van.

2. **Paradis Is Tried and Acquitted for the Murder of Scott Currier**

46. Paradis, Gibson and Amacher were charged with the murder of Currier by the State of Washington. Because of the pre-trial publicity in Spokane their trial was moved from Spokane to Seattle in order to ensure that the three men receive a fair trial.

47. Paradis, Gibson and Amacher were tried jointly. Paradis was represented by Roger Pevin. A jury acquitted all three men of Currier's murder.

3. **Paradis is Tried and Convicted for the Murder of Kimberly Palmer**

48. Paradis was then taken to Idaho and tried for the murder of Palmer. The State's charge and theory of the case was that Palmer was not killed in Spokane, but was taken alive to Mellick Road near Post Falls, Idaho by Paradis, Evans and Gibson, together with the body of Currier who had been killed in Washington. According to the State's hypothesis, Palmer tried to escape on Mellick Road, was captured and manually strangled and thrown down into a stream off Mellick Road.

49. Initially, Paradis and Gibson were to be tried jointly.



NOV 09 '95 10:40PM COUDERT BROTHERS P.12

50. At Paradis' arraignment, in November, 1980, the Idaho court appointed Nordlof & Loats, the local public defender, to represent Paradis.

51. Nordlof & Loats eventually withdrew, after a hearing, because of a purported conflict of interest.

52. Paradis informed the Idaho court that he wished that Roger Pevin, Paradis' attorney at the Currier trial, be allowed to represent him. Pevin was willing to represent Paradis free of charge, and would have done so. The court denied Paradis' demand to have the counsel of his choice, Roger Pevin.

A. <u>The trial judge appoints William Brown, a policeman, to represent Paradis</u>

53. Instead, Judge Gary M. Haman, of the Kootenai County District Court, appointed William Brown ("Brown") to represent Paradis on April 24, 1981.

54. At this time, as Judge Haman knew, Brown had recently been employed by the Kootenai County Prosecutor's Office and was employed as a police officer by the police department of the City of Coeur d'Alene and was deputized by the Kootenai County Sheriff's office.

55. The prosecutors also knew that Brown was employed as a police officer by the police department of the City of Coeur d'Alene and was deputized by the Kootenai County Sheriff's office.

56. Although all were under a duty to do so, neither Judge Haman, the prosecutors nor Brown ever disclosed Brown's employment as a police officer to Paradis.

57. Brown, who died in 1989, concealed his employment as a police officer throughout Paradis' trial, appeal, first state post-conviction proceedings and prior federal habeas corpus proceedings.

B. The trial judge meets secretly with Thomas Gibson and severs the trials

58. After jury selection had begun for the joint trial of Gibson and Paradis, Gibson, his attorney, and Judge Haman met secretly in Judge Haman's chambers. To this day, neither Paradis nor his counsel have been able to learn what was said during this in-chambers meeting.

59. Shortly after this meeting, Paradis learned that during the in-chambers meeting Gibson delivered a letter to Judge Haman confessing that Paradis was not involved in Kimberly Palmer's death.

60. Gibson's letter states, in part:

> I have written a letter to the prosecutor in Washington telling them that the death of Kim Palmer was done in Washington and that I wanted to [illegible] extradition back there to stand trial.
>
> There is one other point I would like to make. Don Paradis was not involved in any way, he is totally innocent of her death before or after it happened.

61. After Judge Haman met with Gibson, Judge Haman severed the trials of Gibson and Paradis for the murder of Palmer.

C. Gibson is convicted and sentenced to death

62. Gibson was tried first. During his trial, Gibson testified that he choked Palmer at Paradis' house in Washington, that Palmer was killed there and her dead body, together with Currier's dead body, were dumped off Mellick Road.



NOV 09 '95 10:42PM COUDERT BROTHERS P.14

63. Gibson was convicted of Palmer's murder and Judge Haman sentenced Gibson to death. In 1986, after his appeal and state post-conviction petition were denied by the Idaho state courts, Gibson filed a federal habeas corpus petition with this Court.

D. <u>Paradis' trial</u>

64. The evidence presented against Paradis at his trial was wholly circumstantial. It consisted of (i) the fact that Paradis and the other two men were seen coming from the place where Kimberly Palmer's body was found; (ii) the inference that Paradis had a motive to kill Palmer -- as she was perhaps a witness to Currier's death in the Spokane house and that Paradis was guilty of that murder (despite his acquittal in Washington); (iii) the difference between the locations and coverings of the bodies of Currier and Palmer; and (iv) the medical opinion testimony of Dr. William Brady ("Brady") that Palmer was strangled where her body was found in Idaho.

65. During Paradis trial, Brown did not call any of the eyewitnesses to Palmer's death to testify as to what occurred at Paradis' house in Spokane, Washington and that Don Paradis did not murder Kimberly Palmer, and did not present the medical evidence that proved that Don Paradis could not have killed the victim in Idaho as alleged. In addition, over Paradis' objection to Brown, Brown refused to allow Paradis to testify on his own behalf.

66. Instead, Brown presented the incredible testimony of one Aera Beaver as an alibi witness. Beaver testified that she was certain that Paradis spent the entire night on which Palmer was killed with her. As Brown knew, Beaver's testimony contradicted her prior statements to the police as well as her testimony at the trial in Washington concerning Currier's death in

which statements and testimony she said she was not certain if she spent Thursday or Friday (the night of Palmer's murder) with Paradis.

67. Paradis objected to Brown concerning Brown's decision to introduce Beaver's testimony, which both Paradis and Brown knew to be false. At one point, Paradis demanded a recess in the trial, and telephoned his former Washington attorney, Roger Pevin, and informed Pevin of Brown's decision to put Beaver on the stand.

68. Pevin left Washington and immediately drove to Coeur d'Alene, where Paradis' trial was taking place. However, Pevin could not persuade Brown to refrain from introducing the incredible testimony of Beaver.

69. The state's case against Paradis hinged on the state's ability to prove that Palmer was killed where her body was found. The circumstantial evidence which the state relied upon was not, by itself, sufficient.

70. Accordingly, the state relied upon the medical testimony of Dr. William Brady ("Brady").

71. At the Paradis' trial, Brady offered his "aspiration of water" hypothesis; that he believed that Palmer was manually strangled at the Mellick Road scene, and as she fell face down, she aspirated water with her terminal breaths from a creek in the ravine where her body was found.

72. At Paradis' trial, Brady testified:

> Q. Finally, Dr. Brady, one last question, do you have an opinion as to the cause of death of Kimberly Ann Palmer?
>
> A. I do, sir.
>
> Q. Would you state that opinion, please.



NOV 09 '95 10:43PM COUDERT BROTHERS P.16

A. Kimberly died because she was strangled, technically asphyxiation by strangulation. She was choked, and I believe basically died as a result of being choked.

Q. What part, if any, did liquid have to play in that death, doctor?

A. An unknown amount, but I think it played a role in the death for the reasons I outlined here, because of the relative absence of petechial hemorrhage, it's not the textbook manual strangulation and the changes in the lungs, and the other changes that I observed ***indicate to me that the immersion in the water, the aspiration of water played a role, if not the terminal event, in the girl's death after she was strangled.***

73. Later, Brady added:

Q. Let me ask you one last question, Dr. Brady. How do you think Kimberly Palmer died?

A. Kimberly Anne Palmer, I believe, was strangled. ***I believe she was strangled, and shortly afterwards aspirated some amount of water during her terminal, during her last moments with her last breath, I think she inhaled some water.***

74. At Paradis' trial, based upon the state of decomposition of the two bodies, Brady testified that Kimberly Palmer died hours after Scott Currier:

Q. Do you have an opinion, Dr. Brady, based upon the difference in extent of decomposition as to the difference in the time that these two individuals been dead?

A. I do have an opinion, Mr. Haws.

Q. Would you express that to the jury, please.

A. ***Scott had been dead a number of hours longer than Kimberly,*** in my opinion.

75. During his testimony at Paradis' trial, Dr. Brady never explained the irreconcilability of the fact that there was a one and one-half inch wound near Palmer's genitalia,



NOV 09 '95 10:44PM COUDERT BROTHERS P.17

but no blood on her clothing, with his theory that she was killed in Idaho during the few minutes Paradis, Gibson and Evans were on the hill.

76. After a trial presided over by Judge Haman, Paradis was convicted of murdering Kimberly Palmer. Although Judge Haman specifically stated that he could not determine whether Paradis actually killed Palmer, Judge Haman nevertheless sentenced Paradis to death.

E. <u>Paradis' motion for a new trial</u>

77. After the trial, Paradis moved for a new trial in 1982, based upon, in part, the testimony of Roseanna Moline.

78. Roseanna Moline testified in support of Paradis' Motion for a New Trial that she was present when Kimberly Palmer died and that Gibson killed Palmer in the Spokane house.

79. Moline testified as follows, speaking of events at the Spokane house:

> A. He [Gibson] said, Kim, come out and you can take your old man home know.
> Q. Then what happened?
> A. Kim grabbed her purse, got up, headed through the door, and I was right behind her, right with her. And when we got through the door, we got through that doorway, she was grabbed.
> Q. Who grabbed her?
> A. Thomas Gibson grabbed her.
> Q. What did he do?
> A. He choked her.
> Q. No, what did you do?
> A. I ran out the door.
> Q. From the period that he grabbed her until you got out the door, did you observe anything, did you observe or see anything?
> A. I heard her choke, I saw her purse drop on the floor, she was like lifted off. I looked down and went out the front door.

80. Judge Haman denied Paradis' motion for a new trial.



NOV 09 '95 10:44PM COUDERT BROTHERS P.18

F. Thomas Gibson's first confession to Palmer's murder

81. In August, 1982, after Paradis' trial, Thomas Gibson confessed to Harley A. Brueck, a prison chaplain, that he (Gibson) killed Palmer, and that Paradis did not kill Palmer.

82. Specifically, Brueck testified at the evidentiary hearing before this Court concerning Paradis' first habeas corpus petition:

> A. He [Gibson] told me that before he took the bread and wine, that there was something on his conscience that he had to tell me, that the man down the other end of the death row tier, was innocent and that he, Tom, had done the crime and that he wanted me to do what I could to get Mr. Paradis off of death row.
> Q. Did he specifically refer to Donald Paradis?
> A. Yes, he did.
> Q. Did he tell you what crime he was referring to?
> A. The killing of the girl in north Idaho.
> Q. Do you recall her name?
> A. Palmer.
> Q. Did he specifically mention that name to you?
> A. Yes, he did.
> Q. What else do you recall that he told you about at that time?
> A. Nothing.
> Q. Did he explain to you why in his opinion Mr. Paradis was innocent of killing Kimberly Palmer?
> A. He just that he had done it and that Don did not do it.

G. Paradis' appeal and first state post-conviction proceeding

83. Paradis appealed his conviction to the Idaho Supreme Court. That court, by a vote of 3-2, affirmed Paradis' conviction and sentence to death. In dissent, Justice Bistline stated: ***"The record before us is literally fraught with error at every stage of the proceedings."***



NOV 09 '95 10:45PM COUDERT BROTHERS P.19

84. Justice Huntley also dissented: "[Paradis'] *trial was conducted in a manner which violates all reasonable concepts of due process and . . . However costly and inconvenient it might be, I would think it better that we remand this case for a new and proper trial rather than to permit the prostitution of those liberties which make it possible for this democracy to function."*

85. After Paradis' appeal was denied, Brown continued to represent Paradis. Brown filed a petition for post-conviction relief for Paradis in the Idaho state court in April 1984.

86. After Paradis' state post-conviction petition was dismissed without an evidentiary hearing in 1985 and that dismissal affirmed by the Idaho Supreme Court in 1986, Paradis obtained new counsel.

H. <u>Thomas Gibson's second confession to Palmer's murder</u>

87. In 1985, after Paradis' trial, Gibson confessed to a newspaper reporter, David Bond. Gibson stated that he (Gibson) killed Kimberly Palmer in Spokane, Washington, and that Paradis was not present when she was killed, or when Scott Currier was killed.

88. Bond has testified to this Court during the proceedings concerning Paradis' first federal habeas corpus petition:

> A. Gibson's description of the death of Kimberly Ann Palmer puts the events in Paradis' home in Spokane. There was a killing, it was horrible, there was a killing of Scott Currier, Palmer's boyfriend, prior, just prior to her death. If I could go back and read this thing to you, but basically, Palmer lost control of herself as I think I would too, started running around the house. Gibson said he went downstairs, Paradis' home, this was happening on the main floor. Went downstairs, obtained a piece of bailing wire, and returned upstairs and as Miss Palmer was running through a



NOV 09 '95 10:46PM COUDERT BROTHERS P.20

doorway, he was on the other side and garroted her, you know, caught her from behind around the neck with the bailing wire.

Q. Did he indicate whether Mr. Paradis was present at all?

A. He was not.

Q. Would that have been true at the time of Scott Currier's death as well?

A. According to Gibson, Paradis was not at the house when Currier died. He was there before and afterwards.

Q. Go on from where you left off with Mr. Gibson describing this bailing wire that he put around the throat of Kimberly Palmer. What else did he describe to you?

A. Well, he described striking her twice very hard with his -- it doesn't say in the story but it was in the chest with his fist. This was after she had been dropped and he said he then --

Q. When you say dropped, you mean to the floor?

A. Yes.

Q. And what impression did you have, she was dropped on her knees, her back?

A. On her back. She was on her back and he then attempted to -- he said he felt for her pulse on her neck with his fingers and he didn't know whether he was feeling his own pulse or hers.

Q. What else?

A. He said if there was any pulse, it was awful weak, that she may have died at that point.

I. <u>Paradis' first federal habeas corpus petition</u>

89. Paradis filed his first petition for habeas corpus relief with this Court in April 1986. In April, 1987, this Court held an evidentiary hearing.

90. Although Paradis subpoenaed both Gibson and Evans, neither man testified at the evidentiary hearing. This Court allowed both Gibson and Evans to exercise their rights under the Fifth Amendment to the United States Constitution. Evans had only been recently apprehended, and was waiting to be tried for the murder of Palmer in Idaho's state court.



NOV 09 '95 10:47PM COUDERT BROTHERS P.21

91. Paradis' counsel requested that Judge Ryan refrain from rendering a decision with respect to Paradis' petition until after Evans testified at his own trial and Judge Ryan had an opportunity to review Evans' testimony. Although Judge Ryan stated that he would wait and consider Evans' testimony in support of Paradis' petition, he did not and dismissed Paradis' petition shortly ***before*** the Evans' trial took place.

92. Paradis' present counsel also tried to obtain the testimony of Charles Amacher for this evidentiary hearing. However, Amacher's counsel stated that Amacher would not testify since he feared being subjected to prosecution in Washington for Palmer's murder.

93. Moline could not be located at the time of the prior evidentiary hearing held in this Court.

J. The trial and acquittal of Larry Evans

94. In 1986, the year when Paradis filed his first federal habeas corpus petition, the Federal Bureau of Investigation finally caught the third man who had been at the Mellick Road scene, Larry Evans. Between the time of Palmer's death and 1986, Evans had been a fugitive from justice.

95. At Evans' own trial in 1987, which occurred several weeks after Paradis' first federal habeas corpus petition had been dismissed, Evans testified that Kimberly Palmer was killed in Spokane, Washington. Evans further testified that Paradis, Gibson, Amacher and Evans loaded the bodies of Palmer and Currier, each wrapped in a sleeping bag, into the Volkswagen van. Paradis, Gibson and Evans then drove the van to Post Falls, Idaho, and left both bodies off Mellick Road in Post Falls. Evans testified:

> Q. Now how did the body get from downstairs upstairs?



NOV 09 '95 10:47PM COUDERT BROTHERS P.22

A. It took three of us to get him upstairs, to get Scott Currier. Chuck -- Mr. Amacher, Paradis and myself took this blue sleeping bag with Scott Currier dead inside of it. I believe he was dead.
Q. You knew he was dead, didn't you.
A. Yes.
Q. Okay.
A. And we took it up on the landing upstairs and [Paradis] said, "let's, you know, let's go put him in the van." And we still, all three, carried him on out to the van and put him in the side door of the Volkswagen van. And he was pretty heavy. And we were, Amacher, Paradis and me, having done that, were standing there. And Chief, or Gibson comes around, he comes around and he's got a red sleeping bag with him.
Q. And how is he carrying it?
A. I think he just he, he just is carrying it in his arms.
Q. Was there something in it? Did it look like something was in it?
A. Yeah, like there was a body in there, a figure in there.
Q. Did you know who that was at that time?
A. No, sir, at that time I didn't know who it was.
Q. In fact that whole night did you ever, with your own eyes, see who that was?
A. No, sir, I didn't.

* * *

Q. Did you how -- did you know whether the person was alive or dead?
A. I thought they were dead.

96. Dr. Brady also testified at the Evans' trial. Dr. Brady's testimony at the Evans' trial was dramatically different then it had been at the Paradis' trial.

97. Contradicting his testimony at the Paradis' trial, Brady admitted that the relative states of decomposition could not be used to determine whether Palmer died before, or after Currier at the Evans trial. Specifically, Brady testified:

Q. How would you respond to this question? ***Isn't it equally possible, doctor, and I'm using the term equally, that Palmer died before Currier based upon your relative measurements of decomposition?*** How you would [sic] answer that question?

A. Just the same way that I did from the transcript that you are reading about it. ***Based on that, equally possible, sure.***



NOV 09 '95 10:48PM COUDERT BROTHERS P.23

98. At the Evans' trial, Brady testified that it was not probable that the aspiration of water played a role in Palmer's death. Brady answered the question *"To a reasonable medical probability, do you have an opinion to a reasonable medical probability, not proof, not absolute, just probability, that the edema in the lungs was caused by the aspiration of water?"* by testifying *"No."*

99. Most importantly, at the Evans' trial, Brady acknowledged the significance of a 1 1/2 inch tear in Palmer's labia and the absence of any trace of blood on or near the wound, or on Palmer's jeans covering the wound. At the Paradis' trial, these facts were not mentioned by Brady and Brown did not ask him about them.

100. Because the prosecution witness, Ruth Jones, established that Paradis was at the Idaho site up Mellick Road for less than 15 to 30 minutes, this means that the absence of blood could not be explained by the State's theory of the crime and Palmer had to have been killed somewhere else, i.e. in Spokane, Washington, and, after the passage of at least one-half hour, the wound inflicted. As Paradis was only at the place where Palmer's body was found for less than 30 minutes at the most, had Paradis killed Palmer there and inflicted the labia wound, the wound would have bled profusely, and at least a trace of blood would have been capable of detection on Palmer's jeans covering the wound. The absence of such blood means that Palmer was killed somewhere else and the wound inflicted at least one-half hour after her death.

101. Given the evidence relating to the post-mortem labia wound and the absence of blood it is ***absolutely impossible*** that Paradis killed Palmer in Idaho.

102. At the Evans trial (unlike the Paradis trial) Brady was confronted with the irreconcilability of the absence of blood near the wound with his previous testimony that Palmer died in Idaho:

> Q. And we have had testimony that the pants were tested. They were tested with a procedure whereby even if the pants were washed in a dilution of a hundred thousand to one or more, it would show blood if blood was there. Does that not trouble you in looking at this case and saying that the wound occurred at the scene perimortem where there would be bleeding and the pants are in direct contact with the wound?
>
> A. ***You bet it troubles me.*** That is why I tried, I guess it was about an hour ago, to explain, and you may recall that I listed, ***fact, it is going to bleed. Fact, there is no blood on the pants. Fact, we have got to somehow explain what happened to the blood.*** And I offered what I think is perhaps a reasonable explanation that the body was tipped, the blood flowed from the area of the birth canal onto the pubic hair. And you will recall that we talked about the washing of the water and that.

103. Later in this examination, Brady was forced to concede that what he offered as "perhaps a reasonable explanation"-- that the blood flowed in a direction so that it did not come in contact with Palmer's jeans--was simply not plausible because the jeans were in contact with the wound.

> Q. Let me stop you there, doctor because does not photograph number 104 show that the pants cross that area and would be in direct contact with the area that you are speaking of where the wound was found.
>
> A. The pants in this picture would cover the birth canal, no question about it.
>
> Q. Okay. So if it covers the birth canal then it's covering the area where the wound was found?
>
> A. That's right, Mr. Pevin.

104. The labia wound and the absence of blood are consistent with all of the evidence in this case and with the occurrence of Palmer's death in Spokane, Washington, the infliction



NOV 09 '95 10:50PM COUDERT BROTHERS P.25

of the labia wound at least one-half hour after her death, the transport of her body to Post Falls, and the infliction of post-mortem chest wounds noted by Brady as her body was dragged under the barbed wire fence between the road and the stream in which Palmer's body was found. This is precisely the manner in which Palmer's death occurred according to the testimony of the five witnesses who did not testify at Paradis' trial.

105. Except for the testimony of Brady, the evidence against Larry Evans was identical to that against Paradis since Evans' alleged involvement in Palmer's murder was identical to that of Paradis. Larry Evans was acquitted of Palmer's murder.

106. Shortly before Evans was tried and acquitted for Palmer's murder, this Court dismissed Paradis' prior petition for habeas corpus relief. Seven years later, the United States Court of Appeals for the Ninth Circuit affirmed that decision.

K. <u>Paradis' learns that his court-appointed trial attorney was also a policeman</u>

107. In July 1993, Paradis and his present counsel first learned that Brown had been a Coeur d'Alene police officer when this fact was disclosed by Captain Ken Timmons of the Coeur d'Alene police department to the Coeur d'Alene Press in July 1993. Counsel immediately made further inquiries and requests for information. As a result, in April 1994 Paradis first learned that Brown was deputized as a Kootenai County Sheriff when this fact was disclosed to his counsel by Roland Watson, Brown's former supervisor on the Coeur d'Alene police force.

L. <u>Paradis' Counsel learn that Terry Jones witnessed Palmer's death in Spokane</u>

108. In April, 1994, after Paradis' prior habeas corpus petition was dismissed, Terry Jones contacted Paradis' counsel. Neither Paradis nor his counsel knew, until this point in time, that Jones had been at Paradis' house the night Palmer was killed.

109. In April 1994, as soon as Terry Jones contacted Paradis' present counsel, he immediately flew to Oregon to meet with Jones in May 1994.

110. Terry Jones now swears that neither the police nor Brown had ever sought to discuss Palmer's death with him.

111. Terry Jones has sworn in an affidavit in May, 1994 that during the night in latter June 1980 he was at a friend's house. Jones' friend, Norman, received a telephone call and told Jones to go over to Paradis' house in Spokane quickly. Jones did so. Upon his arrival at Paradis' house, Jones saw the dead bodies of a man and a woman (Scott Currier and Kimberly Palmer) at Paradis' house in the early morning of June 21, 1980 hours before Paradis is said to have killed Palmer in Post Falls, Idaho.

M. <u>Amacher's attorney, Sid Wurzburg, comes forward with evidence exonerating Paradis</u>

112. Sid Wurzburg ("Wurzburg"), a respected attorney in Eastern Washington, represented Paradis' co-defendant, Charles Amacher, at the Currier trial.

113. After speaking with a reporter from the <u>New Yorker</u> magazine in late 1994, Wurzburg informed Paradis' present counsel that Amacher had died in 1992 and that he (Wurzburg) was in the possession of information indicating that Paradis did not kill Palmer. Although Wurzburg wished to reveal this information which he had kept secret for fourteen years, lest Paradis be executed for a crime he did not commit, Wurzburg could not ethically reveal this information because of the attorney-client privilege.

114. On January 13, 1995, long after Paradis' prior federal habeas corpus petition had been dismissed, the personal representative of the estate of Charles Amacher released Wurzburg from his obligations under the attorney-client privilege.

115. Immediately thereafter, in January 1995, Wurzburg stated in an affidavit that Amacher told Wurzburg, before Paradis, Gibson and Amacher were tried for Currier's murder and before Paradis was tried for Kimberly Palmers' murder in Idaho, that Palmer and Currier were both killed in Spokane, Washington and that Paradis was not present when the murders took place.

116. Given the circumstances in which Amacher related the events to Wurzburg, Wurzburg's testimony is inherently reliable. Amacher told Wurzburg that Palmer died in Spokane before any of the trials in Washington or Idaho concerning the murders of Currier and Palmer. Not only did Amacher have no reason to lie to Wurzburg in confidence, he had every reason to tell his own attorney the truth in order to obtain effective representation at his trial for the murder of Scott Currier.

117. Amacher's statements to Wurzburg are confirmed by John P. Luster, who is presently a Magistrate in the Magistrate's Division of the District Court of the First Judicial District in and for Kootenai County.

118. Prior to his death, Amacher had told Magistrate Luster in 1985, that he, Amacher, killed Currier.

119. Amacher also confirmed to Luster that it was Gibson who killed Palmer.

120. Finally, Amacher stated to Luster that Paradis had nothing to do with the deaths of Palmer and Currier.



NOV 09 '95 10:52PM COUDERT BROTHERS P.28

N. Dr. Brady Admits that All Traces of Blood from the Labia Wound Could Not Be Washed Away

121. In affirming this Court's earlier decision to deny Paradis habeas corpus relief, the Court of Appeals held "that the circumstantial evidence presented at trial, ***together with Dr. Brady's testimony***, is sufficient, when viewed in the light most favorable to the prosecution, to support the jury's finding that the murder occurred in Idaho." 954 F.2d 1483 at 1487. The Court of Appeals reasoned that: "the lack of blood on Palmer's jeans does not render the jury's verdict irrational. The jury could have rationally inferred from all the evidence that any blood on the jeans was washed away by the combined effect of rain water and the flow of the stream." Id.

122. Contrary to that conclusion, in 1995 Dr. Brady appeared on the Northwest Report television show concerning Paradis' case. During an interview, Dr. Brady admitted that all trace of blood from the labia wound could not have been washed away from Palmer's jeans.

O. Three Nationally Renowned Pathologists Step Forward and Swear that Testimony of Dr. Brady at the Paradis Trial is without Scientific Basis

123. Three nationally renowned pathologists have now come forward and will provide affidavits, which will be filed with the Court in this proceeding, stating that testimony given by Dr. Brady at the Paradis trial, including his testimony that the victim aspirated water from the stream where her body was found and therefore died there, was conjecture, was without scientific basis and was misleading. Dr. Brady's testimony at the trial was gravely prejudicial to Paradis in that it permitted the jury to find that the victim died at the Idaho site when Paradis was present, although the victim actually was killed hours earlier in Spokane, Washington when Paradis was not present.

124. The three pathologists are:

1. Todd Grey, M.D., presently the Chief Medical Examiner for the State of Utah;

2. Kris Sperry, M.D., presently the Deputy Chief Medical Examiner for Fulton County, Atlanta, Georgia; and

3. Garry F. Peterson, presently the Chief Medical Examiner in the Hennepin County Medical Examiner's Office, Minneapolis, Minnesota.

125. Each pathologist has reviewed Dr. Brady's testimony at the Paradis trial, Dr. Brady's report on the autopsy of Palmer, and all photographs and slides taken of Palmer at her autopsy which have been supplied to Petitioner.

126. In addition, among other things, Dr. Grey and Dr. Sperry will swear that, because of the absence of blood from Palmer's labia wound, the wound must have been inflicted long after Palmer's death. Because Paradis was only at the Idaho site for at most 15 to 30 minutes, it would not be possible for a reasonable jury which understands the significance of the labia wound and the absence of blood to conclude that Palmer was murdered in Idaho as alleged.

## CLAIMS FOR RELIEF

I. Paradis' Conviction And Sentence Were Imposed In Violation Of His Rights Under The Sixth, Eighth And Fourteenth Amendments To The Constitution Of The United States Because His Counsel's Representation Of Him Was Affected By A Conflict Of Interest Arising From Counsel's Employment As A Coeur d'Alene Police Officer And His Deputization As A Kootenai County Deputy Sheriff, At The Time Of Paradis' Trial, Sentencing, Appeal And Post-Conviction Proceedings, And Because The Trial Court, Knowing of the Conflict of Interest, Did Not Make Any Inquiry Into That Conflict And Its Potential affects Upon Paradis' Trial Counsel.

127. Brown's duties as a police officer and/or deputy sheriff created a conflict of interest in challenging the police investigation of Kimberly Palmer's death. Throughout Paradis' trial, Brown did not challenge the prosecution's theory that Kimberly Palmer was taken alive from Spokane to Post Falls, Idaho and killed near Mellick Road in Post Falls. Brown failed (i) to call eyewitnesses whose testimony that would have established that Palmer was killed in Spokane, Washington, not in Idaho, and (ii) to present to or explain to the jury forensic evidence that would have established that it was impossible that the victim was killed in Idaho as alleged.

128. At the time of Paradis' trial, Brown had just graduated from law school and had an unsuccessful law practice as a single practitioner. Brown depended upon his job as a Coeur d'Alene police officer for support. Brown therefore could not risk alienating the Kootenai County Prosecutor's office or the police in handling Paradis' case.

129. Brown's commission as a deputy sheriff and police officer created a conflict of interest in confronting testimony by witnesses employed by law enforcement agencies, including the Kootenai County Sheriff's Office. These witnesses included Terry Thomason, Lamar Rapp and George Elliot of the Kootenai County Sheriff's Office; Hollis Kenner of the City of Post Falls Police; and Greg Yeager, Donald McCabe and James Hansen of the Spokane County Sheriff's Office.

130. There were numerous connections between the police departments of the City of Coeur d'Alene and the office of the Sheriff of Kootenai County. Both police departments cooperated fully with each other in investigations and police actions. Both departments used the same jail. Each department scanned the radio frequency of the other.

131. In addition, the departments were cross-deputized. As a matter of policy, every member of the Coeur d'Alene police force was deputized as a Kootenai County sheriff.

132. Between 1979 and 1986, the Coeur d'Alene police force and the Kootenai County Sheriff's office set up a Joint Task Force on Drugs, which included uniformed police officers from both departments and undercover agents. Brown, as a Coeur d'Alene police officer, assisted members of the task force.

133. Brown's duties as a Coeur d'Alene police officer included leading a course as a weapons expert in which members of the Kootenai County Sheriff's office were Brown's students.

134. Brown's conflicts of interest actually affected his representation of Paradis at the guilt phase of Paradis trial in the following respects:

135. Brown's employment as a police officer adversely affected his examination of his colleague, Terry Thomason of the Kootenai County Sheriff's office. Thomason was the first police officer at the scene where Palmer's body was found and discovered Palmer's body.

136. Brown never questioned Thomason about the appearance of Palmer's body when Thomason found it, the lack of any evidence of a struggle at the Mellick Road scene, or about the presence or absence of blood on Palmer's body or Palmer's jeans, or about the existence or origin or appearance of wounds on Palmer's body when it was discovered.

137. By failing seriously to examine Thomason, Brown lost the opportunity to establish that there was no blood on Palmer's jeans when Thomason first saw Palmer's body, but there was blood on Palmer's nose and ear, which the rainstorm from the night before had not washed



NOV 09 '95 10:55PM COUDERT BROTHERS P.32

away. Establishing the absence of blood on Palmer's jeans was critical to the defense of Paradis as the absence of such blood was a fact irreconcilable with Palmer's death in Idaho.

138. Brown's employment as a police officer adversely affected his examination of his colleague, George Elliot, a lieutenant in the Kootenai County Sheriff's office. Elliot was the detective on-call when Palmer's body was discovered, was one of the first police officers at the scene where Palmer's body was discovered, and was in charge of the investigation of the Kootenai County Sheriff's office concerning Palmer's death.

139. Brown's examination of Elliot lasted for less than six transcript pages. Brown never asked Elliot about the condition of Palmer's body when he first saw it, about the lack of evidence of a struggle at the Mellick Road scene, about the presence or absence of blood on Palmer's body or Palmer's jeans, or about the existence or origin or appearance of wounds on Palmer's body.

140. By failing to seriously examine Elliot, Brown lost the opportunity to establish that there was no blood on Palmer's jeans when Elliot first saw Palmer's body, and there was blood on Palmer's nose and ear, which the rainstorm from the night before had not washed away.

141. Brown's employment as a police officer adversely affected his representation of Paradis in that Brown accepted the investigation of the crime by his law enforcement colleagues as accurate and complete. As a result, Brown failed to conduct his own investigation of the crime.

142. Specifically, Brown failed to locate and speak to Roseanna Moline before Paradis' trial. Brown made no effort to locate, and did not locate, either Terry Jones or Charles Amacher both of whom have stated that Palmer was killed in Washington.



NOV 09 '95 10:55PM COUDERT BROTHERS P.33

143. Similarly, Brown failed to adequately investigate the crime scene. Brown failed to investigate whether the ditch in which Palmer's body was found ever had water in it on the night of the crime and that it was therefore impossible for Palmer to have aspirated water as Dr. Brady opined.

144. Furthermore, because Brown was a policeman, he trusted his fellow law enforcement officers to do his job for him. As a result, Brown failed to attend the juror's visit to the site and allowed the jurors to visit the site without his supervision but with journalists and court officers.

145. Because Brown was a police officer, he did not believe in his client's honesty or truthfulness, as Brown's law enforcement colleagues contended Paradis was a murderer. Therefore, Brown presented to the jury not the truth, as Paradis told him, but an alibi defense based solely upon the incredible testimony of Aera Beaver.

146. Paradis presented the conflict of interest of his court-appointed attorney to the Idaho courts as soon as it became known to him in 1993 and the Idaho courts have refused to re-examine Paradis' conviction and sentence in light of this fact.

II. Paradis' Conviction And Sentence Of Death, And The Idaho Courts' Failure To Correct Or Vacate Them, Violate His Rights Under The Sixth, Eighth and Fourteenth Amendments To The Constitution Of The United States Because Of The Overwhelming Evidence That Paradis Is Innocent Of The Offense For Which He Was Convicted And Sentenced, The Idaho Courts' Unfair Refusal To Consider That Evidence, Or To Give It Weight In Mitigation.

147. The evidence against Paradis was completely circumstantial. Not one of the witnesses to Kimberly Palmer's death in Spokane, Washington testified at Paradis' trial. The forensic evidence which now proves that it was impossible for Paradis to have committed this crime was not presented at his trial.



NOV 09 '95 10:56PM COUDERT BROTHERS P.34

148. There are now ***five eyewitnesses*** to Kimberly Palmer's murder in Spokane, Washington. Every one of them exonerates Paradis of Palmer's murder.

149. They are Evans, Amacher, Jones, Gibson and Moline. ***None were called by Brown to testify at Paradis' trial.*** No court anywhere has considered all of this testimony. All these individuals have testified that Kimberly Palmer was killed in Washington, hours before Paradis was seen coming from the place where Palmer's body was discovered. Moreover, Gibson has repeatedly confessed to her murder in Spokane. Three witnesses, including Gibson, have testified that Paradis was not even present when Kimberly Palmer was killed.

150. After Paradis' prior habeas corpus petition was dismissed, Dr. Brady, the State's forensic pathologist whose testimony was critical to the State's case against Paradis that he killed Kimberly Palmer near Mellick Road, changed his testimony regarding the time and place of Palmer's death.

151. At the Evans trial, which was held after Paradis' prior habeas corpus petition was dismissed, Dr. Brady testified that (i) it is equally likely that Kimberly Palmer died before Scott Currier; and (ii) he no longer believed that it was probable that Kimberly Palmer died as she aspirated water from the stream near Mellick Road in which her body was found. Accordingly, at the Evans trial Brady could offer no certain support for his hypothesis that Palmer was killed in Idaho.

152. Brady also testified at the Evans trial that he could not reconcile the fact that there was no blood near a one and one-half inch tear of Palmer's labia or on Palmer's jeans covering the labia wound with Palmer's death near Mellick Road in Post Falls, Idaho. Brady testified that a wound inflicted any sooner than one-half hour after death will bleed. Since the State's



NOV 09 '95 10:57PM COUDERT BROTHERS P.35

evidence showed that Paradis was at the Mellick Road site for less than one-half hour and did not therefore have time to commit the crime there, it is impossible that Palmer was taken alive to that scene and killed there.

153. Paradis has always denied his guilt. No witness has ever alleged that Paradis has said anything inconsistent with his denials.

154. Paradis presented the changes in Brady's testimony and the testimony of the five witnesses to Kimberly Palmer's death to the Idaho state courts as soon as this information became available to Paradis and his counsel. The Idaho state courts have refused to reexamine Paradis' conviction and/or sentence in light of these newly discovered facts or allow Paradis to present this information at an evidentiary hearing.

155. There is not one eyewitness who has ever said (i) that Palmer died in Idaho or (ii) that Paradis played any role in her death at any place. Except for the testimony of Dr. Brady at the Paradis trial which he has changed in his testimony at the Evans trial, there is no evidence which establishes (1) that Palmer died in Idaho or (2) that Paradis played any role in her death at any place.

156. Based upon all of the evidence, it is clear that no reasonable fact finder would have found Paradis guilty or eligible for a death sentence for the murder of Kimberly Palmer.

III. Paradis Sentence Of Death Was Imposed In Violation Of His Rights Under The Eighth And Fourteenth Amendments To The Constitution Of The United States Because The Evidence Was Insufficient To Convince A Rational Finder Of Fact, Beyond A Reasonable Doubt, Of The Existence Of The Sole Aggravating Factor Utilized By The Idaho Courts To Make Paradis Eligible For A Death Sentence, Under The Limiting Construction That Constitutionally Must Be Applied To That Aggravating Factor.

157. Paradis' death sentence was based upon only one aggravating factor, that by the circumstances of Palmer's death Paradis demonstrated an utter disregard for human life.



NOV 09 '95 10:58PM COUDERT BROTHERS P.36

Subsequent to the imposition of the death sentence, this factor has been defined to mean *"a killer who kills without feeling or sympathy."*

158. However, the sentencing judge specifically stated: "That **either** [Paradis], Thomas Henry Gibson, ***or*** Larry Evans actually killed Kimberly Palmer." Later, the sentencing judge added: ***"With respect to [Paradis'] argument that the evidence must show that [Paradis] directly committed the offense charged, there is no doubt that no such finding can be made."***

159. In addition, the sentencing judge admitted in his sentencing findings that he could not determine:

(a) whether Paradis was present at his house in Spokane at any time when Currier and Palmer were also present;

(b) who killed Scott Currier;

(c) who put Currier's body into a sleeping bag and then put the bag into the blue Volkswagen van; and

(d) if Paradis was in the van when it left Spokane.

160. Ultimately, the sentencing judge could only find beyond a reasonable doubt that Paradis was seen near the place where Kimberly Palmer's body was discovered and that a jury had found Paradis guilty.

161. The sentencing judge nonetheless made the utter disregard finding.

162. After Paradis' death sentence was imposed and affirmed, the United States Supreme Court in <u>Creech v. Arave</u>, 113 S.Ct. 1534 (1993) found the limiting construction placed upon the utter disregard aggravating factor constitutional and held that the Idaho utter disregard factor means *"a killer who kills without feeling or sympathy."*



NOV 09 '95 10:59PM COUDERT BROTHERS P.37

163. Since the sentencing judge could not find that Paradis killed Kimberly Palmer, the sentencing judge could not have found either that Paradis killed Palmer or that he did so without feeling or sympathy. Nor could any rational factfinder find beyond a reasonable doubt either that Paradis killed Palmer or that he killed her without feeling or sympathy.

164. Absent the required proof that Paradis killed Palmer and that he did so without feeling or sympathy, the sentence of death could not be imposed upon Paradis. No rational factfinder could find beyond a reasonable doubt that Paradis killed Palmer with "utter disregard for human life" as it has now been constitutionally limited and defined, from the evidence in the trial record above; it is even clear that no rational fact finder could find Paradis eligible for the death sentence under Idaho law in light of the presence of available evidence.

IV. <u>Paradis' Sentence of Death, And the Idaho Courts' Failure To Vacate That Sentence In Light Of The Acquittal of Larry Evans, Violate Paradis' Rights Under the Sixth, Eighth and Fourteenth Amendments to the Constitution of the United States.</u>

165. The third man seen together with Gibson and Paradis coming from the place where Palmer's body was later discovered was Larry Evans.

166. At the trial of Evans for the murder of Palmer in 1987, Evans testified that he was at the place where Palmer's body was later discovered. Evans was acquitted.

167. Paradis presented the fact of the acquittal of Evans for Palmer's murder to the Idaho district court, as new evidence in mitigation. The Idaho district court had jurisdiction to consider that evidence in mitigation, but refused to do so. The case is pending before the Idaho Supreme Court. In effect, the Idaho district court has held that the acquittal of an equally guilty co-defendant was not a mitigating circumstance which could warrant reduction of a sentence of death. That holding violates the Eighth and Fourteenth Amendments.



NOV 09 '95 10:59PM COUDERT BROTHERS P.38

168. The foregoing constitutional violations have resulted in the wrongful conviction of Paradis. In light of the clear and convincing evidence presented above, no reasonable juror would or could have found Paradis guilty of the crime charged and no reasonable sentencer would or could have found him eligible for the death penalty.

169. But for the constitutional violations claimed above, and in light of the presently available evidence no reasonable and rational juror would convict Paradis of Kimberly Palmer's murder, and no reasonable and rational factfinder would find Paradis eligible for a sentence of death under Idaho law.

170. Paradis's conviction and death sentence constitute a fundamental miscarriage of justice and therefore should be reviewed despite any procedural bars resulting from prior state or federal proceedings. Absent the constitutional violations claimed above, and in the light of presently available evidence, it is clear that no reasonable juror would convict Paradis of Kimberly Palmer's murder, and no reasonable factfinder could find him eligible for a death sentence under Idaho law.

## PRAYER

WHEREFORE, Paradis prays that this Court:

1. Issue a writ of habeas corpus to have Paradis brought before it so that he may be discharged from his unconstitutional confinement and restraint and relieved of his unconstitutional sentence of death;

2. Permit Paradis, who is indigent, to proceed without prepayment of costs or fees;



NOV 09 '95 11:00PM COUDERT BROTHERS P.39

3. Grant Paradis, who is indigent, sufficient funds to secure expert testimony necessary to prove the facts as alleged in this petition;

4. Order to Respondent to produce the transcripts of clerk's records from all proceedings in state court, including post conviction motions;

5. Require Respondent to file an answer which specifically admits or denies Paradis' factual allegations and, to the extent they are denied or controverted, resolve those disputes by:

a. Reviewing the entire state court record, including transcripts, clerks' records, minute entries, brief and opinions;

b. Ordering discovery on behalf of Paradis pursuant to Rule 6 of the Rules Governing Section 2254 cases;

c. Granting Paradis the authority to obtain subpoenas <u>in forma pauperis</u> for witnesses and documents necessary to prove the facts as alleged in this petition; and

d. Appointing experts to assist Paradis in preparation and presentation of his claims;

6. Conduct a hearing at which argument and proof may be offered concerning the allegations of this petition; and

7. Grant such other relief as may be just and appropriate.

Dated: November 9, 1995

Respectfully submitted,

COUDERT BROTHERS
1114 Avenue of the Americas
New York, New York 10036-7703
Telephone: (212) 626-4400

ATTORNEYS FOR PETITIONER

By: ______________________
Edwin S. Matthews, Jr.



P.40

NOV 09 '95 11:01PM COUDERT BROTHERS

STATE OF IDAHO )
:ss.
COUNTY OF ADA )

DONALD M. PARADIS, being first duly sworn, upon oath, according to law, deposes and says:

I have read the foregoing Petition for Writ of Habeas Corpus and know the contents thereof to be true, and I believe I am entitled to the relief sought therein.

Donald M. Paradis

SUBSCRIBED and SWORN to before me this 13 day of November, 1995.

SHELLY L. WILLIAMS
NOTARY PUBLIC
STATE OF IDAHO